GRAHAM v. PEALE, PEACOCK & KERR OF NEW YORK.

(Circuit Court of Appeals, First Circuit. October 5, 1909.)

No. 804.

FRAUD (§ 20*)—FALSE REPRESENTATIONS—FAILURE TO COLLECT CLAIM.

Defendant, while acting for a trust company to which a corporation was largely indebted, induced plaintiff's attorney to refrain from pressing plaintiff's claim against the corporation then due by attachment or other process by falsely representing to such attorney that the corporation was in good financial condition, that the trust company would extend the corporation's credit by loaning an additional $25,000, and that, if plaintiff and the trust company and another constituting the corporation's lar-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gest creditors would permit the corporation to continue, the corporation would make pro rata payments, and would be able to relieve itself from its difficulties. The trust company at this time, however, was secretly gaining absolute control of the corporation's assets, and recovered for itself a large portion of its indebtedness before plaintiff discovered defendant's duplicity, when the corporation was found to be bankrupt and proceedings in bankruptcy were instituted against it. *Held*, that such facts were insufficient to sustain an action for deceit against defendant. Bradley v. Fuller, 118 Mass. 239, applied.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 18; Dec. Dig. § 20.*]

In Error to the Circuit Court of the United States for the District of Massachusetts.

Action by Peale, Peacock & Kerr of New York against John M. Graham. Judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions.

Robert M. Morse (William M. Richardson, on brief), for plaintiff in error.

Ezra R. Thayer and Harold S. Davis, for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This was a suit at common law for an alleged deceit, in which the plaintiff in the Circuit Court recovered a verdict for $20,005.81, with interest, being substantially the entire amount of its debt as hereinafter described. Thereupon the defendant in that court sued out this writ of error. It will be convenient to describe the parties in this opinion as arranged in the Circuit Court. Many questions were discussed before us which it is not necessary for us to consider; because, unless an entirely different case is hereafter made in the Circuit Court than what appears on this record, the point on which we let our decision turn will dispose of the litigation. In order to properly settle this point we must take the case as told by the plaintiff, which is as follows:

The Thomas & Pike Company (hereinafter called the "Coal Company") was a corporation selling coal at retail in Boston. It had a capital stock of $100,000, and did a business of about 80,000 tons a year. Its treasurer and manager was Herbert W. Pike, who had been in the business, either as treasurer of the corporation or as partner in the firm which preceded it, for many years. The secretary of the corporation was Fred L. Childs, who came into the business about 1900. Before that time he had for many years been discount clerk at the International Trust Company, of which the defendant was the president, and his relations with the defendant were very close. He caused the Coal Company to bank with the Trust Company. As secretary of the Coal Company, he attended largely to its financial affairs. In 1902, when the coal strike began, the credit and business of the Coal Company were good. In the early winter of 1902 the Coal Company adopted the policy of keeping itself fully supplied, and it had coal all winter to meet all demands. It had to pay high prices for the coal, but

the profit was very large, as it sold at retail all the way from $18 to $25 a ton. But this condition of affairs was unexpectedly interrupted. The weather grew warm in January, and remained so until the demand for coal greatly decreased, and prices dropped accordingly. As a result the Coal Company found itself by the end of January with a large stock of coal on hand, on which it was likely to make a heavy loss. It had bought its coal from various dealers, much the largest part of its supply coming from E. B. Townsend. Among others it bought several cargoes from the plaintiff, the last two of which, amounting to $35,505.81, were shipped on January 8th and January 21st, and arrived in Boston about ten days after those dates. By the terms of the sale the Coal Company was bound to pay cash on receipt of bill of lading; but it did not do so. On January 26th Pike asked Edgarton, the broker who had sold the coal for the plaintiff, to resell it at a considerable loss, and promised to make up the difference. Edgarton could not get his price, and Pike presently reported that he had resold the cargoes himself. He promised to pay the plaintiff in a day or two, as soon as he received the money; but he did not pay. On Monday, February 9th, he came in and asked Edgarton to see the defendant. This Edgarton did at once. The defendant urged the desirability of granting some indulgence to the Coal Company, expressed the utmost confidence in it as a thrifty going concern, worthy of the support of the few larger creditors, and as proof of his confidence said that his bank was ready to advance it, if necessary, $25,000 more than it then owed. Upon his advice Edgarton wrote to New York laying the matter before the plaintiff, and in consequence F. D. Peale, Esq., a New York lawyer, who was the plaintiff's counsel, and also its secretary and director, came to Boston on February 12th to attend to the matter.

Peale called on the defendant, who discussed the Coal Company's affairs in detail, enlarging on the value of its business and the excellence of its prospects. He argued that its present difficulties were merely temporary, resulting from its overstock of coal and the peculiar conditions caused by the strike; and he strongly recommended as the only wise course that the three large creditors stand together, and let the Coal Company pay off its debts pro rata as it sold its coal and collected its accounts. Peale testified:

"I asked him what they owed his bank, and he said about $65,000; and he said he had such confidence in their ability to pull through that he had said to them already, and he repeated it to me, that he was willing to loan them an additional $25,000 if that should prove necessary in connection with the conduct of their business. He further said that he had laid before Mr. Townsend, whose claim was even larger than the Trust Company's, the plan of having the three creditors stand together; and that Townsend had assented to it if the plaintiff was willing. He said he and Mr. Townsend had agreed that was the best thing to do, and that they were both willing to do it, and that it simply was up to us, and our decision would determine whether the plan should become effective or not."

Peale was persuaded by these representations, and accepted the defendant's view as to the best course to be pursued. Accordingly he returned to New York without insisting on immediate payment. The plaintiff's directors approved his decision, and permitted the Coal Com-

pany to go on with its business, supposing that sundry payments which were thereafter received from time to time, amounting in all to $15,500, were made in accordance with the plan proposed. On June 10th these payments ceased, and in consequence Peale came to Boston in July and saw Childs. After assurances from the latter that he had kept faith with the plaintiff, and had paid it pro rata with Townsend and the Trust Company, and after every excuse and device to prevent an investigation of this statement had been exhausted, Peale at last obtained access to the Coal Company's books. From these and from the bookkeeper, he learned for the first time, not only that the Trust Company's debt had been paid in full, and that Townsend had received over $90,000 on account of his claim, leaving a balance due him of only about $20,000, but, furthermore, that the business of the Coal Company had long since been secretly sold out, leaving no assets for the payment of the plaintiff's claim except some accounts of doubtful value, and that this winding up of its affairs had been completed in April, long before the dates of the letters in which, as late as the end of May, Childs had kept up the pretense that he was actively engaged in the affairs of a going concern. The plaintiff immediately filed a petition in bankruptcy against the Coal Company, and it was adjudicated a bankrupt. The plaintiff disclosed its present claim at the outset of the bankruptcy proceedings, but it did not sue the defendant until after the trial of a suit brought against the Trust Company by the trustee in bankruptcy, preferring that litigation for the benefit of the estate should have precedence over its private claim.

On February 12, 1903, the Trust Company held 11 notes of the Coal Company, amounting to $68,500, falling due at different dates between February 16th and May 15th of the same year. On February 2d the Trust Company lent to the Manufacturers' Commercial Company, a corporation engaged in lending money on the security of accounts, the sum of $48,000, taking as security an assignment of open accounts for $64,694.61 due the Coal Company. These were substantially all its good accounts. The Manufacturers' Commercial Company drew a check for $48,000, and turned it over to the Coal Company. The Coal Company simultaneously deposited the $48,000 to its credit with the Trust Company, drew a check in favor of the Trust Company for $67,878.09, the amount of its outstanding notes discounted at 6 per cent., and paid off those notes. To make this check good the Trust Company gave the Coal Company an additional credit of $17,000 for which it took a demand note. At the close of the day it had thus changed its claim against the Coal Company from $68,500, no part of which was due, to $17,000 due on demand, and had received through the Manufacturers' Commercial Company an assignment of all the Coal Company's good accounts. The final stages of these transactions were going on at the very moment the defendant was talking to Peale. And on the following day, by lending $5,800 more to the Coal Company upon a note which gave the holder the right to apply the collateral to any other obligations of the Trust Company, and taking as security an assignment of the equity in the accounts received the day before from the Manufacturers' Commercial Company, the Trust Company completed its hold on those accounts as security for all its claims. The transac-

tion between the Manufacturers' Commercial Company and the Coal Company began on February 9th, when Childs called on Wolcott, the manager of the Manufacturers' Commercial Company, and applied for the loan. Wolcott said that he could not make it without the consent of the Trust Company, from which he would have to get the money. This consent he obtained. On that day or the next the. Manufacturers' Commercial Company agreed to make the loan, and on February 11th, the list of accounts and the other papers were completed, and Childs took them in to Wolcott; but the latter refused to accept them because of a formal defect in the execution, and the transaction accordingly did not go through till the next day.

The plaintiff contended that the defendant's representations to Peale that there was a plan on foot by which the three large creditors should permit the Coal Company to go along and should accept payments pro rata as it collected its accounts, that Townsend had assented to this, that the Trust Company was ready to do so, and was ready to increase the Trust Company's loan by further advances to the extent of $25,000, if necessary, were all willfully false; that they were intended to prevent the plaintiff, the only creditor whose demand was pressing and required instant attention, to abstain from insisting on the immediate payment which it had been promised and was entitled to receive; and that they accomplished their purpose.

The only portion of the plaintiff's declaration, as finally settled by amendment, which we need cite, is as follows:

"Whereas, in fact, at the time when the defendant made the said representations each of said representations was altogether fraudulent and false and no plan or arrangement whereby said three parties should act together and give time and accept payment of their several debts only pro rata or co-operate in any way was then or ever had been under consideration, and said Townsend had never assented to any such plan or arrangement, and the defendant as president of said International Trust Company was not willing to enter into any such plan or arrangement, or to advance $25,000 or any other sum in addition to said sums advanced before February 12, 1903, but, on the contrary, the defendant was then secretly arranging and contriving with said Thomas & Pike Company to place said International Trust Company in a more favorable position than the plaintiff and said Townsend, and to obtain advantages for said International Trust Company over plaintiff and said Townsend in case said Thomas & Pike Company should prove to be unable to pay its debts in full, all of which the defendant then well knew. And by means of the said representations the plaintiff, acting on the faith thereof and in the belief that the same were true, was induced. to abstain from insisting on immediate payment of said indebtedness due to it from said Thomas & Pike Company and from taking immediate steps to collect, and from collecting, the full amount of said indebtedness as it otherwise could and would have done, and to accept from time to time certain payments on account of said indebtedness, amounting in all to the sum of $15,500, in the belief that said payments were made in accordance with said pretended plan and arrangement, and said Thomas & Pike Company thereafter became bankrupt and wholly unable to pay the whole or any part of the balance of its said indebtedness to the plaintiff over and above said sum of $15,500, and the plaintiff thereby wholly lost said balance of said indebtedness and otherwise suffered great damage, all by reason of said false and fraudulent representations of the defendant."

The charge of the judge very carefully pointed out to the jury certain elements necessary to maintain an action for deceit, and in all those particulars it was thoroughly guarded. The portions of the

charge essential to the point which we will consider were summed up as follows:

"I am asked to instruct you, and I do instruct you, that if the plaintiff intended to demand immediate payment in full of the debt owed it by the defendant, and if it refrained from so doing until the Thomas & Pike Company had become altogether insolvent, in reliance upon the false representations of the defendant, and if, at the time such representations were made, the Thomas & Pike Company were solvent, so that, as the result of the demand, the plaintiff would have obtained payment in full, he is entitled to payment in full. That I have already charged you, as matter of law, but have suggested to you that it appears to me to be highly improbable that, under any circumstances, the Thomas & Pike Company could have paid all its debts in full. You are judges of that as a question of fact. I have a right to suggest to you that the difficulties in the way of that conclusion are at least very considerable."

The defendant relies on Bradley v. Fuller, 118 Mass. 239, decided on September 3, 1875, the substance of which he correctly states as follows:

"In Bradley v. Fuller, 118 Mass. 239, it was held that, if a person who has a claim against a corporation, which he intends to enforce by an attachment of its property, is purposely induced by false and fraudulent representations of its treasurer to refrain from making an attachment, and all the property of the corporation is subsequently attached for the debt of another person and is sold on execution, an action of tort for such fraudulent representations will not lie against the treasurer."

Taking this case as thus explained in connection with the fact that the plaintiff had not even sued out a writ of attachment with any present intention of seizing the property of the debtor in question here, and had in no way secured any lien on, or any present right of any kind to, the assets of its debtor, Bradley v. Fuller seems decisive against the plaintiff on the record before us. The decision, so far as brought to our attention, must be accepted as the settled law of Massachusetts, where these transactions occurred; and we are unable to perceive any reason why we should not, on this point, follow the local law as thus promulgated by the local courts. All the later Massachusetts decisions cited by the plaintiff have substantial elements not found here or in Bradley v. Fuller. There is nothing in the nature of the question, or in any decision of the Supreme Court, so far as we have been able to discover, which justifies us in making a departure therefrom. On the other hand, the decisions of the Supreme Court support it. Findlay v. McAllister, 113 U. S. 104, 5 Sup. Ct. 401, 28 L. Ed. 930, decided on January 12, 1885, has been pressed on us. We find nothing therein inconsistent with Bradley v. Fuller; but, on the other hand, the expressions in the opinion, so far as they furnish a rule for our guidance, are in harmony with it. Indeed, Bradley v. Fuller is cited by the court at page 114 of 113 U. S., page 406 of 5 Sup. Ct. (28 L. Ed. 930), without any dissent therefrom or disapproval thereof. Certain Pennsylvania decisions which look to sustaining the plaintiff's case, cited at page 113, the opinion disapproves of at page 114 of 113 U. S., page 406 of 5 Sup. Ct. (28 L. Ed. 930) in the following words:

"The three cases last cited extend the rule further than the exigency of the present case requires, and further than this court has been disposed to go."

In Yates v. Joyce, 11 Johns. (N. Y.) 136, cited at page 113 of 113 U. S., page 405 of 5 Sup. Ct. (28 L. Ed. 930), the plaintiff had an ex-

isting lien on the property removed or destroyed. In Smith v. Tonstall, Carthew, 3, also cited at page 111 of 113 U. S., page 404 of 5 Sup. Ct. (28 L. Ed. 930), the plaintiff had had a judgment on a scire facias to have execution, so that he had advanced beyond the conditions in Bradley v. Fuller, and beyond those in the case at bar. However, Findlay v. McAllister reaches clearly only a case where there is an existing right of a specific character; that is, the plaintiff there had secured a writ of mandamus directing a levy of a tax to pay his debt, which levy the defendants there had conspired to prevent. The general distinction which takes Bradley v. Fuller out of that case was clearly made at page 111 of 113 U. S., page 404 of 5 Sup. Ct. (28 L. Ed. 930), as follows:

"The right of a judgment creditor to proceed by action against those who rescue the person of his debtor arrested on mesne or final process, or interfere with the goods of his debtor so as to prevent a levy or sale by the sheriff to satisfy his judgment, is well recognized at common law."

And so again at pages 114 and 115 of 113 U. S., page 406 of 5 Sup. Ct. (28 L. Ed. 930), where the court lays aside, as not pertinent to the issue before it, cases in which "the plaintiff was merely a general creditor, and had no judgment or attachment or lien."

Smith v. Tonstall need not be referred to further, but it is interesting to do so. On account of statutory changes in the law during the more than 200 years since it was decided, it seems to have become obsolete in England. It is not cited in Mews' Digest of 1897, nor is it referred to by either Pollock or Mayne. By the common law, execution had relation to the time of the awarding of judgment, and from that time it imposed a lien on all the defendant's goods, even though sold bona fide and for a valuable consideration. The statute of 29 Charles II relieved this condition only in favor of purchasers bona fide. Consequently, as against the defendant in that case, who was not a bona fide purchaser, and who removed the goods out of the jurisdiction, the plaintiff had an existing present right. Therefore the case is like Yates v. Joyce, already explained, with only the unimportant difference that in one there was a lien in hand on personal property and in the other a like lien on realty.

Adler v. Fenton, 24 How. 407, 16 L. Ed. 696, decided that a creditor whose debt was not due could not bring a suit against the debtor and persons conspiring with him to fraudulently conceal his goods. The opinion does not point out that the fact that the debt was not due was an essential matter. At page 412 it states that the creditor "lost no claim upon or interest in the property, for he never acquired any." It adds:

"The most that can be said is that he intended to attach the property, and the wrongful act of the defendant has prevented him from executing his intention."

It also observes that the claims of morality and justice require that there should be protection against such acts of dishonest debtors; "but the Legislature must determine upon the remedies appropriate for this end." In some states this suggestion has been acted on, and statutes have been enacted of a penal character against persons receiving conveyances of property intended to defraud creditors.

Adler v. Fenton is explained in Lincoln v. Claflin, 7 Wall. 132, 137, 19 L. Ed. 106, wherein it is said:

"The creditors in that case possessed no lien upon or interest in the property of their debtors to impair or clog in any respect the right of the latter to make any use or disposition of it they saw proper. The exercise of that right, whatever the motive, violated no existing right of the creditors, and consequently furnished them no ground of action."

Bigelow on Torts (8th Ed., 1907) p. 101, asserts without any question the rule laid down in Bradley v. Fuller quite as broadly as we accept it. A careful examination of the other text-writers has failed to help us in either direction. Nevertheless, the decisions we have cited proceed on grounds so broad as to lead to the result that we should apply Bradley v. Fuller, 118 Mass. 239. As Bradley v. Fuller goes to the root of the plaintiff's suit, we need not follow this record further.

The judgment of the Circuit Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings in accordance with law; and the plaintiff in error recovers his costs of appeal.

ALDRICH, District Judge (concurring in the result, but disagreeing with the ground of decision). I am far from agreeing with the idea that there can be no recovery by a party who has an overdue claim and intends to demand immediate payment of a solvent debtor, and who is directly influenced from making his demand and enforcing payment by the willfully false representations of another creditor, who intends that the false representations shall be acted upon, and who, by means thereof, reaps the benefit of his fraud by collecting his own claim in full, thereby rendering the debtor insolvent and thus causing the party whom he has misled to suffer substantial pecuniary loss; and I do not think the right of recovery depends at all in such a case upon whether the injured creditor had proceeded so far as to take out a writ.

The learned judge submitted the case to the jury with distinct and emphatic instructions that the plaintiff could not recover unless the representations and the story which the defendant told were willfully false, "that it is a lie, that the defendant lied." There were also explicit instructions that the plaintiff must have intended to demand immediate payment when the debtor was solvent, and that he must have refrained from doing so by reason of the false representations of the defendant, and but for such representations that the plaintiff would have obtained payment in full.

Aside from the foregoing explicit instructions, the theory on which the case was submitted and the general principles governing were stated as follows:

"For the plaintiff to recover, he must satisfy you first that the representations which he alleges, the story which he says defendant told, is false, not merely that it is untrue in the sense that it is not accurate, that it does not correspond to the facts, but that it is willfully false, that it is a lie, that the defendant lied. That is the first thing the plaintiff must establish.

"The second point is that the lie is concerned with matter of fact. It must not be merely a breach of a promise or something of that sort. It must be a

false statement regarding a fact. And what a fact is in the eye of the law I shall discuss with you later.

"In the third place, the statement must be made by the defendant with the intention that the plaintiff shall act upon it; that is, a mere passing remark, not made with any intention that the plaintiff shall act upon it, is not such a false representation that the plaintiff can recover.

"And the fourth requisite to the plaintiff's case, the fourth thing that the plaintiff must prove, is that he did act upon it, that he did act upon this lie, to his own pecuniary hurt.

"Those are the four matters concerning which the plaintiff must satisfy you here. First, that the statement was a lie. It must be false. If it should happen to be true, the plaintiff cannot recover. It must be not only untrue in the sense that it does not correspond with the facts, but that it is willfully untrue, willfully false, false to the defendant's knowledge. That is the first. The second is that it must be a representation of fact. The third is that it must be a representation made with the intention that the plaintiff shall act upon it. And the fourth is that the plaintiff must have acted upon it to his own pecuniary hurt."

In short, as disclosed by the record and as established by the verdict of the jury upon the issues of fact submitted, the defendant, representing another creditor of the Coal Company, through false representations, stood the plaintiff off from collecting its claim, and by means thereof collected in full the claim of the Trust Company, which he represented, and of which he was president. Holding that there can be no recovery in such a situation where damages are susceptible of legal proof would be setting a premium on one's wrongdoing for one's own benefit.

I do not conceive that Bradley v. Fuller, 118 Mass. 239, at all applies to a situation like this, because in Bradley v. Fuller it was not the party who made the false representations that reaped the benefit of the fraud. That was simply a case where the treasurer of a debtor corporation (not a representative of another creditor like Graham) by false representations induced a creditor not to sue, and thereafter another creditor, one not tainted with fraud at all, stepped in and attached the property of the corporation, and that case therefore presents an entirely different question. If in Bradley v. Fuller the attaching creditor who collected his claim had secured the pecuniary advantage and benefit through fraud which lulled the first creditor into nonaction, and if legal remedy had been sought against him, it would be like the case at bar. Again, this case is not like Bradley v. Fuller and Adler v. Fenton, but in some respects more like Lincoln v. Claflin, because the action here is not against the debtor or the representative of a debtor, and because the question here is not whether the plaintiff, as a ground of action, had acquired a lien upon or an interest in the property of the debtor, but, quite independent of such considerations, whether the plaintiff, who was a creditor, has a right of action against the representative of another creditor, grounded upon fraud and deceit, successfully practiced under circumstances of trust and reliance.

But aside from the fundamental question of the right of recovery by an injured party upon the ground of fraud against another who has for himself, or for the interests which he represents, intentionally reaped a harvest by means thereof under circumstances where the question of damages would be susceptible of solution with legal certainty, I think the record presents a serious question whether the

plaintiff in this case is entitled to recover. This question results because, under peculiar and exceptional circumstances, his alleged damages are so far in the field of contingency as to present a situation of legal uncertainty in that respect. There were many inherent contingencies. If Peale, Peacock & Kerr had pressed payment, they might have secured their entire indebtedness, and they might not. If not, they might have secured a writ and made an attachment, and they might not. And in case of an attachment the Coal Company might have been thrown into bankruptcy, thus involving the contingencies and uncertainties of such a proceeding, and a result based upon unforeseen and unexpected depreciations. Or if they had been voluntarily paid without attachment, under possible bankruptcy proceedings and a possible showing of belief of insolvency, the money might have been recovered back by a trustee in bankruptcy upon the ground that the payment amounted to a voidable preference.

The question of legal uncertainty in respect to damages was raised by the requests and assignment of errors (20 to 25, inclusive), and the court was, in effect, asked to direct a verdict for the defendant on the ground that the plaintiff had proved no legal damages. It is true the court, in effect, told the jury that the damages must be made certain, that the jury must find that the Coal Company was solvent, and that the plaintiff would, in fact, have collected its entire claim; but, after all, the question still remains fairly enough, under the requests, whether the proofs were of such a character of legal certainty as to entitle the plaintiff to have that question submitted to the jury. Apparently the whole case in respect to damages was in the field of conjecture, and apparently all theories about damages are necessarily speculative and uncertain, thus presenting, I fear, one of those unfortunate situations where it is impossible for an injured party to show in a legal sense the extent of his injury, or even to show with legal certainty that he was injured at all. Lamb v. Stone, 11 Pick. (Mass.) 527, 534; Adler v. Fenton, 24 How. 407, 412, 16 L. Ed. 696.

I cannot agree to the ground of decision disclosed in the majority opinion, but, as my impression is that the plaintiff is not in a position to make his damages legally certain, I agree with the result reached.