# The First State Bank of Nortonville v. Morton, et al.

(Decided January 19, 1912.)

## Appeal from Hopkins Circuit Court.

1. Contract—Plea of no Consideration.—Where the appellee gave his note as a substitute for the note of a customer which the bank had theretofore discounted, under an agreement with the executive officer of the bank that the arrangement was temporary only, and for the purpose of enabling the bank to make a statement· to the Secretary of State, which would not show the customer's note among the bank assets, and that after the statement should be made to the Secretary of State, appellee's note should be returned to him, and the customer's note returned to the bank, all of which was done, thereby restoring the original situation, the appellee was not estopped to rely upon a want of consideration as a defense to an action upon his note which had been returned to him, it not appearing that any depositors or creditors of the bank were complaining.

2. Bank Directors.—A higher degree of vigilance is to be required of the president of a bank whose salary for general supervision of its affairs is sufficient to compensate him in devoting his entire time and attention to its business, than of a president who is a mere figure-head of the institution. In the latter case the president, in the absence of fraud, is liable only for gross neglect in the management of the corporation.

3. Bank Officers—Liability for Negligence.—Where the executive affairs are under the control of a salaried cashier, an unsalaried president is not liable to the bank for the negligence of the cashier in making loans upon insufficient security.

4. Bank Officers—Liability for Negligence.—Where a stranger and his associates bought the stock of a suspended bank at a greatly reduced price, with full knowledge of the condition of the bank, its assets, and the transactions between it and appellee concerning the substituted note of appellee, which had been temporarily used by the bank and subsequently returned to him, neither the stranger nor his associates nor the bank can recover upon the

note of the appellee which had been so used and returned to him.

5.   Bank Officer—Negligence.—The unsalaried president of a bank is not liable to the bank for the act of its salaried cashier and executive officer in lending more than twenty per cent. of the capital stock and surplus of the bank to one person.

6.   Appeals.—The Court of Appeals can not review a judgment of the Circuit Court from which no appeal has been taken.

JOHNSON & JENNINGS and ROGERS & WILKINS for appellant.

GORDON, GORDON & COX for appellee, Morton.

C. J. WADDELL and SPENCER, BRILL & HATFIELD for the Evansville Brewing Co.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

In 1906, the First State Bank of Nortonville, Ky., was organized by the appellee, Morton, and other citizens of that neighborhood, under the general banking laws of this State, with a capital of $15,000. Morton, who was a farmer, and lived three miles from Nortonville, where the bank was located, was chosen President, and G. O. Prowse was chosen Cashier. Morton had no experience whatever in the banking business, having been a farmer all of his life, but Prowse was an experienced man in the business, and was the active officer in the management of the bank, at a salary of $1,000 per year. Morton received no salary, and it was understood that he was to perform such duties as President as might be expected from one holding that nominal position.

In the course of its business the bank discounted a note given by A. W. Brasher to the Brasher Coal Company on December 10th, 1908, for $4,500, and due one year thereafter. This note was, in turn, re-discounted by the appellant to a bank in Evansville, Ind. When it matured on December 10th, 1909, it was paid by the proceeds of Brasher's two notes, one for $2,250 and payable to the appellant, and another for a like sum to Prowse and Morton, which they endorsed to the appellant, and it discounted both notes. At the same time Brasher gave appellant a second mortgage upon realty for $3,010 to secure the first named note and another note for $760. Subsequently, appellant assigned the first note for $2,250 to the Evansville Brewing Company for value, and before it matured. There is some confusion in the testi-

mony as to the details of this transaction; but as all agree that it resulted in the two Brasher notes being discounted by appellant, the precise course of the transaction is immaterial.

Conceiving, however, that in lending $4,500 to the Brasher Coal Company it might have violated the statute, which prohibits a bank from lending more than twenty per cent. of its capital stock and surplus, unless it be secured by mortgage, to any person, Prowse conceived a plan to take up the Brasher notes temporarily, and at the same time secure it by a mortgage upon real estate. Consequently, on December 10th, 1909, Prowse and Morton executed two notes for $2,295 each, to the bank, and substituted them in lieu of the two notes which had theretofore been given by the coal company for the original $4,500 debt, and attached to each of these new notes for $2,295 one of the Brasher notes for $2,250. Morton testifies that this was done at the request of Prowse, who was the active officer and manager of the bank, with the distinct understanding that his note was to be held only for a short time, and until the report should have been made to the Secretary of State, and was then to be surrendered to him; he, at the same time, to return to the bank the Brasher note for $2,250, which he held as collateral. Consequently, on January 29th, 1910, the note for $2,295 was returned to Morton, and marked paid upon the books of the bank, and he, in turn, re-assigned to the bank, without recourse, the original Brasher note for $2,250. In the meantime the bank had gotten into financial difficulties, and on January 27, 1910, Prowse, the Cashier, abandoned the bank, and it was closed by the State officers.

Shortly thereafter, Lon Rogers and W. C. Greening, partners as Rogers & Greening, of Lexington, agreed with the controlling stockholders of the bank, to buy their stock for ten per cent. of its par value, and re-organize the bank. This contract was reduced to writing, and by its terms Rogers & Greening agreed, among other things: (1) To settle, pay off and discharge out of their own means, and at their own cost and charges, all depositors having money on deposit with the bank at the time it closed its doors, as shown by the books and records of the bank, or made to appear in any legal proceeding; (2) to pay all re-discounts made by the bank, or its officers or agents, ''save and except the re-discount of a note executed by John B. Brasher, the re-discount of

which is not shown on the books of the bank, and said to be in the hands of some brewing company, which said re-discount is said to amount to $2,250;" and (3) "all other legal liabilities, of any kind or character whatsoever, incurred by the First State Bank in the course of its business, prior to this date." The contract contained this further clause: "And said vendees hereby expressly guarantee and undertake that they will relieve and release all said vendors from any and all personal liability as stockholders, and hold them and each of them harmless from all claims, damages, judgments, costs, fees and expenses, and from all assessments which may be made or claimed from them as stockholders, or as transferors of stock in said bank, and from all other liability, of every kind and character, as stockholders; it being expressly understood that none of the vendors are to be hereby released from any legal liability as directors or debtors of or to said bank, which may have accrued to said bank prior to this date. It is further understood and agreed, that in order to make this instrument clear, that if the note, or re-discount of the John B. Brasher note for $2,250 to the brewing company, above referred to, shall, on investigation, be found to be legal, then the payment thereof shall be deemed to be hereby guaranteed; but whether found to be legal, or not, all the vendors, as stockholders, shall be relieved and guaranteed, and held harmless, from any and all liability for or on account thereof, in the same way as from any and all other claims or demands against said bank."

Rogers & Greening gave a bond for the performance of their contract, and they and their associates thereupon took charge of and re-organized the bank, and re-opened it for business. On April 16, 1910, the bank instituted this suit against the appellee, Morton, to recover judgment for $2,295, subject to a credit of $1,751.72, which was represented by a deposit of Morton's in the bank, and which it applied as a credit upon said alleged indebtedness of $2,295. Other claims were also included in the original petition; but, upon the court having required appellant to elect, it filed a reformed and amended petition, which restricted its recovery to the item of $2,295, as above shown, and expressly reserved its right to bring future suits upon the other items. The propriety of the court's ruling in this respect has been suggested here; but in view of the fact that the amended petition was taken as the substituted petition, the plaintiff re-

serving its right to bring other suits upon the other matters which had been incorporated into the original petition, it is not deemed necessary to pass upon the ruling of the court in that connection, since the action has not been prepared upon those reserved items, and a reversal upon that point could not lead to any substantial results.

A recovery was sought by the appellant upon three grounds: (1) upon the covenants of the note; (2) if it should fail on that, then for negligence upon the part of Morton as the President of the bank, in taking the original $4,500 Brasher note, when the makers of that note were insolvent; and, (3) if it should fail on both of these grounds, it nevertheless, is still entitled to recover because the indebtedness represented by the $4,500 Brasher note violated the statute, which prohibited a bank from lending more than twenty per cent. of its capital and surplus to any one person, unless secured by mortgage. In defense, Morton relies upon the agreement made with Prowse for the return of his note as above indicated, and alleges that said note was executed without any consideration; that when Rogers and his associates, the present owners of the stock of the bank, and the only parties interested in a recovery, bought it for ten per cent. of the par value thereof, they did so after a full examination of all the books, notes, accounts, possessions, resources and liabilities of the bank, and that they took said stock with full knowledge of its condition, and with exact and definite information that the note herein sought to be charged against Morton had been fully paid, as shown upon the books of the bank; and lastly, that he was not the officer who made the loans alleged to have been negligently made, or in violation of the statute above referred to. Morton also asserted a counterclaim for $1,751.72, which he had on deposit in the bank at the time of its failure.

By its intervening petition, the Evansville Brewing Asociation filed the note which John B. Brasher had executed to appellant on December 10th, 1909, for $2,250, and secured by a mortgage, alleging that the appellant had endorsed and transferred said note to said brewing association before its maturity, and for value. It prayed judgment against John B. Brasher, The Brasher Coal Company and the appellant, and asked an enforcement of its mortgage lien. Upon the trial the court dismissed appellant's petition; gave judgment for appellee for $1,-751.72 upon his counterclaim; and it also gave the Evans-

ville Brewing Association judgment for $2,250 upon its intervening petition. The bank prosecutes this appeal.

1. The evidence sustains Morton's contention of the understanding with the bank through Prowse, its cashier, as to the purpose in giving the note. It is contended, however, by appellant, that said agreement was made for the fraudulent purpose of deceiving the State Bank Examiner, and that Morton is estopped to take advantage of the plea of no consideration. It must be borne in mind, however, that no showing has been made that any creditors are unsatisfied; on the contrary, by the express terms of their contract, Rogers & Greening agreed to satisfy all the creditors of the bank, and it is to be presumed they have done so. The question for decision upon this point, therefore, is, can Morton rely upon the plea of no consideration, assuming, for the sake of the argument, that the note was given for the purpose of deceiving the State Bank Examiner?

Substantially this identical question arose, and was decided by the United States Circuit Court in Lyons v. Westwater, 173 Fed., 11, where a National Bank, desiring to increase its capital stock, found it necessary to dispose of three hundred shares of the increased stock before it could do business on the increase. In order to deceive the comptroller, it induced one Robert Lyons to give his note for the price thereof, which was passed into the assets of the bank, and the stock issued to one of the bank's officers, the certificate being held by the bank, the intention being to sell the stock as occasion offered, and apply the proceeds to the note. Lyons received nothing for the note; paid no interest thereon; the dividends from the unsold stock, received by the officer holding the stock, being applied thereto. Lyons having failed in business, and it being necessary to substitute other paper for the note, one of the bank's officers procured the defendant, Westwater, who had no knowledge of the preceding facts to execute his note to the bank, on the cashier's agreement that he should not be liable thereon. The cashier as part of the transaction, wrote defendant, Westwater, a letter reciting that it was expressly understood that he should not be liable on the note, and that the bank would return same to the defendant, on request, without payment. Defendant renewed the note from time to time; paid no interest thereon, and received no dividends on the stock. It was held that the bank's receiver was not entitled to enforce the

note against the defendant, there being no showing that it was necessary to pay creditors, after the enforcement of stockholders liabilities.

A consideration sufficient to uphold a contract, must be either a benefit to the promisor, or a detriment to the promisee. It is also a well settled proposition of law, that as between the original parties, the consideration of a promissory note may be impeached, and a total failure of consideration will bar a recovery.

In the case at bar Morton received no benefit whatever, and the bank incurred no disadvantage whatever, by the transaction. On the contrary, at the end of the transaction each party stood exactly as he did at the beginning of it. This question was considered in Dowagiac Manufacturing Co. vs. Vanvalkenberg, 11 Minn., 1, where the court, in affirming a judgment for the defendant, said:

"The note was originally executed by the respondent's son, and the respondent was in no manner connected with the note or the consideration for which it was given. After the note was past due, an agent of the plaintiff called upon the respondent and told him that he had the note against his son; that it was due; that he was going to sue his son, but he did not have time to go and see him. The agent then requested the respondent to put his name on the note, so that he could show his company that he had not been idle, but had been doing something. The respondent then signed the note, at the agent's request, without any consideration whatever. The son never requested the respondent to sign the note, and had no knowledge that he had done so, until long afterwards. Other than as stated, there was no evidence that there was any agreement to extend the time of the payment of the note, or that the time of the note was ever extended in reliance on the fact that respondent had signed it."

"It is clear from the evidence, that the respondent signed the note without any circumstances of advantage to his son, or disadvantage to the plaintiff, and without any consideration. Security Bank vs. Bell, 21 N. W., 470; Turtle v. Sergeant, 63 Minn., 211; 65 N. W., 349; 56 Am. St. Rep., 475. The evidence discloses none of the elements of an estoppel."

The appellant must, therefore, fail to recover upon the covenant, for want of a supporting consideration.

2. Quite a good deal of evidence has been taken upon

the issue of appellee's negligence in making the original loan of $4,500.00 to the Brasher Coal Company. Morton was an unpaid officer of the bank, and lived upon his farm in the country. He was in no way familiar with the clerical features of the banking business, and never attempted to manage the bank to any greater extent than a director of the bank would have done. It was fully understood that Prowse was the executive officer of the bank, and Morton a mere unsalaried figurehead. The Brasher Coal Company was a large institution, and doing a large business. Furthermore, John B. Brasher, its President, says that he did all of his banking business with Prowse, and that Morton was not one of the directors who authorized this loan to the Brasher Coal Company. His alleged negligence consisted of an act of omission of duty.

Morton's liability, therefore, is to be measured by the rule announced in Jones vs. Johnson, 86 Ky., 530, where the court said:

"James Johnson was made president of the bank and his co-appellees, Thierman, Clifton, Chase and Hecht, were the directors. They seem, from the facts before us, to have been inexperienced in the business of banking. The stockholders and directors were looking to Dorn, cashier, as a medium through which the enterprise was to be made a success. Dorn, as cashier, seems to have had almost complete control of the bank, and the directors having the unmost confidence in his integrity, as well as his pecuniary ability to meet all his engagements, were not vigilant in the examination of his accounts with the bank, and within less than a year he became largely indebted to it, and, in fact, had wrecked the entire enterprise. There is no fraud shown or combination between the directors and Dorn to defraud the bank, or any fact tending to establish neglect, except the implicit confidence they had in Dorn's financial ability, and personal integrity; and so far as the discount of his paper is concerned, although worthless, these directors are not liable. That a higher degree of vigilance is to be required of the president of a bank, whose salary for general supervision of its affairs, is sufficient to compensate him in devoting his entire time and attention to its business, may be conceded; but directors who receive no compensation, or a president, who is a mere figurehead of the institution, are liable only for gross neglect (in

the absence of fraud) in the management of the corporation, and this rule must certainly apply when stockholders are attempting to make them liable.''

See also, Savings Bank of Louisville's Assignee vs. Caperton, 37 Ky., 322. Under this rule Morton is not liable to the bank for not preventing Prowse from making the Brasher loan.

3. There is a further reason, however, why appellant should not prevail in this suit. Rogers & Greening, and their associates, obtained control of the bank through their purchase of a large amount of stock for ten per cent. of its par value, and with full knowledge of the facts upon which they now rely for a recovery. A recovery, therefore, by the bank for the alleged mismanagement of Morton would be for the benefit of Rogers & Greening, and the present stockholders, and would amount, in substance, to a recovery back to them of the purchase money which they paid Morton for his stock, since the money recovered for the corporation would be distributed to them as stockholders of the bank, as now constituted.

This question arose in Home Fire Insurance Co. vs. Barber, 67 Neb., 645, where Barber, the President of the Insurance Company, and the other stockholders, sold their stock in the company to Funkhouser and his associates, for a greatly reduced price. In that case, as in this, the vendees assumed the management of plaintiff company, and brought suit against Barber, charging that before their purchase of the stock, Barber had misman-, aged its business, and made loans of its money in a way prohibited by statute. In the course of a learned and exhaustive opinion by Commissioner Roscoe Pound denying the relief asked, the court said:

''It must be determined whether the present stockholders or any of them are entitled to complain of the acts of the defendant and of his past management of the company; for if any of them are so entitled, there can be no doubt of the right and duty of the corporation to maintain this suit. It would be maintainable in such a case even though the wrong-doers continued to be stockholders and would share the proceeds. 1 Morawetz, Private Corporations, Sec. 294. We have therefore to consider first, how far, if at all, subsequent shareholders may complain of prior mismanagement of the corporation. Next we must consider how far subsequent shareholders may complain of mismanagement when they

hold through such management, or have acquired their shares from persons who participated therein. The third question to be considered is whether the result of a recovery in this case would be inequitable, as permitting the present stockholders to recover back purchase-money, or a portion thereof, for which they received full consideration, and to acquire shares worth $115.00 each at $55.00 a share, and in addition thereto, recover and divide among themselves a further sum of $60.00 a share, imposed upon the defendant Barber for his delinquencies in matters which have in no way injured the present stockholders, or any of them, or their interests. Finally, assuming that by reason of the foregoing propositions the present stockholders are in no position to complain and have no standing in equity, may the court look beyond the corporation to the ultimate and substantial beneficiaries of a recovery, or is it bound to deal with the corporation as a separate person in all respects?

"Sound reason and good authority sustain the rule that a purchaser of stock can not complain of the prior acts and management of the corporation. (Authorities cited).

"In Alexander v. Searcy, 61 Ga. 536, the court says (p. 550): 'The weight of authority seems to be that a person who did not own stock at the time of the transactions complained of, cannot complain or bring a suit to have them declared illegal.' In United States Securities Co. v. Louisiana Electric Light Co., it is said (p. 675): 'As a general proposition, the purchaser of stock in a corporation is not allowed to attack the acts and management of the company prior to the acquisition of his stock; otherwise, we might have a case where stock duly represented in a corporation consented to and participated in bad management and waste and, after reaping the benefits from such transactions, could be easily passed into hands of a subsequent purchaser, who could make his harvest by appearing and contesting the very acts and conduct which his vendor had consented to.' These remarks are not without application to the case at bar. The present shareholders are all subsequent purchasers; they obtained their stock through the defendant Barber; they hold a large number of their shares under a purchase from him and his associates through the very mismanagement now complained of; a majority of the remaining shares come directly from Barber and his associates in the wrongs upon which this suit

is based. In other words, the present stockholders are contesting acts through which they get title to a large portion of their stock, and acts which those through whom they derived the greater part of the remainder could not have challenged because they participated therein, and, by contesting these acts, which did not injure any of the present stockholders in the least, are recovering back a large part of the purchase price of stock which was admittedly worth all that they paid for it. Such cases illustrate forcibly the wisdom of confining complaints of this kind to those who were stockholders at the time or their successors by operation of law.

"There is another and still stronger reason why the present stockholders have no standing in a court of equity to complain of the transactions on which this suit is based. To permit them to recover, under the circumstances of the case at bar, would be highly inequitable. It would be to give them moneys to which they have no just title or claim whatever, and enable them to speculate upon wrongs done to others with which they have no concern. It would enable them to recover back a large part of the purchase-money they paid and agreed to pay for the stock, notwithstanding the stock was worth all they paid for it, and notwithstanding they obtained and now retain all that they bargained for. So long as they receive all that was contracted for, there is no equity in allowing them to recover back a considerable portion of what they paid, merely because their vendor had previously wronged some one else who could have obtained redress in the name of the corporation which they are now able to use. This is especially manifest in respect to the dividends. As Barber and his associates acquired shares by unauthorized borrowings of the company's money, and so held them in trust for the corporation, as representing all the then stockholders, in equity the dividends paid upon such shares doubtless were received impressed with the same trust. But who were the beneficiaries in that trust? Not the other stockholders only, but Barber and his associates, together with such remaining stockholders. Barber and his associates held most of the stock outside of the shares in question. Instead of receiving all the dividends on those shares, they should have received, in equity, the greater portion only. Had a stockholder gone into equity at that time and recovered the dividends for the company, they would simply have been for distribution

among those who held the shares not subject to a trust for the company, and Barber and his associates would still have been the heaviest beneficiaries. For it is well settled that a recovery in such case inures to the benefit of all stockholders, as well those who were wrong-doers as those who were innocent. 4 Thompson, Corporations, Sec. 4491. But after an entirely new set of stockholders have come in, holding these shares under Barber and his associates and the remainder of the latter's shares under pur-chase from them, to let them recover back these divi-dends is to let them reclaim over fifty per cent. of the purchase money, and recover from Barber moneys which in equity belonged to him when he took them. The fact that a relatively small portion belonged to others can not alter the unconscionable character of such a recovery, so long as the present stockholders are not those others and have no standing in equity as their representatives. Recovery by or for the benefit of the present stockholders means, to put it plainly, that through the instrumentality of a court of equity they are to get shares, worth by their own valuation $115.00 each, for $55.00 each; are to get back-dividends which never would have been payable to them in any event and were not bargained for when they bought, and are to receive, in addition to the shares worth $1.15 on the dollar, 60 cents more on each dollar, imposed on Barber for his delinquencies. Barber wronged the old stock-holders. His conduct in many respects was unconsion-able and indefensible. But his fellow-stockholders were supine for many years. They took no steps to investi-gate what he was doing, or to protect or assert their rights. Now third parties, who bought all of Barber's shares, including those which he held as a result of his wrongful manipulations, seek to assert those rights and reap a profit thereby. Because the inequitable conduct of Barber shocks the conscience of a chancellor is no reason why he should give his conscience a further shock by allowing Funkhouser and his associates to recover money to which they have no legal or equitable claim.

"Conceding, then, that all of the present stockholders are so circumstanced that no relief should be afforded them in a court of equity, may the corporation recover, notwithstanding? We think not. Where a corporation is not asserting or endeavoring to protect a title to prop-erty, it can only maintain a suit in equity as the repre-

sentative of its stockholders; if they have no standing in equity to entitle them to the relief sought for their benefit, they cannot obtain such relief through the corporation or in its name. (Authorities cited). It would be a reproach to courts of equity if this were not so. If a court of equity could not look behind the corporation to the shareholders, who are the real and substantial beneficiaries, and ascertain whether these ultimate beneficiaries of the relief it is asked to grant have any standing to demand it, the maxim that equity looks to the substance and not the form would be very much limited in its application. 'It is the province and delight of equity to brush away mere forms of law.' Post, J., in Fitzgerald v. Fitzgerald & Mallory Construction Co., 44 Nebr., 463, 492. Nowhere is it more necessary for courts of equity to adhere steadfastly to this maxim, and avoid the danger of allowing their remedies to be abused, by penetrating all legal fictions and disguises, than in the complex relations growing out of corporate affairs. Accordingly, courts and text-writers have been in entire agreement that equity will look behind the corporate entity, and consider who are the real and substantial parties in interest, whenever it becomes necessary to do so to promote justice or obviate inequitable results.

"Cases of this kind must be differentiated sharply from those where the proceeding is at law, or where a question of title to the corporate property is involved. There is no question that stockholders, as such, have no title to the corporate property which they can convey or encumber in their own names. (Authorities cited). But this, in substance, is only another way of saying that the corporation must act through its proper agents and in the prescribed way. 4 Thompson, Corporations, Sec. 4476. It is also true, for the convenience of legal procedure and to avoid confusion, that restitution or redress, even where the injury has affected the interests of the stockholders, is to be sought primarily through the corporation. But this rule always yields to the requirements of equity, and is cast aside in view of the fact that the stockholders are the real beneficiaries whenever the usual course is not open. Brewer v. Boston Theatre, supra; 4 Thompson, Corporations, Sec. 4477. Cases like the one at bar are obviously within the same reason. To permit persons to recover through the medium of a court of equity that to which they are not entitled, simply because the nominal re-

covery is by a distinct person through whom they receive the whole actual and substantial benefit, and that nominal person would, in ordinary cases, as representing beneficiaries having a right to recover, be entitled to relief, is a perversion of equity. It turns principles meant to do justice into rules to be administered strictly without regard to the result. It is contrary to the very genius of equity. When the corporation comes into equity and seeks equitable relief, we ought to look at the substance of the proceeding, and if the beneficiaries of the judgment sought have no standing in equity to recover, we ought not to become befogged by the fiction of corporate individuality, and apply the principles of equity to reach an inequitable result.

"Hence, we think the rule to apply to such cases is this: Where a corporation is proceeding at law or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover. This rule finds many illustrations in the authorities."

On the question of negligence, therefore, the judgment denying appellant relief was right, whether it be placed upon the ground that Morton was not negligent in permitting Prowse to make the original loan to the Brasher Coal Company; or whether it be rested upon the equitable principles above stated.

4. Neither did the court err in refusing to give plaintiff judgment under the third paragraph of the petition, which relies upon Morton's alleged illegal act in lending more than twenty per cent. of the capital stock and surplus of the bank to the Brasher Coal Company, since that transaction was had with Prowse, the cashier, and not with Morton.

5. Finally, it is contended that the judgment of the Evansville Brewing Association against appellant should be reversed for want of proof of the allegations of the

petition. That question, however, is not before us, since. appellant did not take an appeal from that portion of the judgment.

Judgment affirmed.